# EXHIBIT B

## ARBITRATION AWARD

### FMCS CASE NO. 251127-01567 (Owens Discharge)
### IGUA LOCAL 170, UNION AND TRIPLE CANOPY, INC, EMPLOYER

For the Union: Scott Kamins, Esq.            Place of Hearing:  Virtual via ZOOM
For the Employer:   Kevin J. Morris, Esq.,   Date of Hearing:  March 4, 2025
                                             Date of Award:    June 13, 2025

## BACKGROUND

Triple Canopy, a Constellis Company (hereinafter "Triple Canopy" or the "Employer") and the International Guard Union of America ("IGUA") and its  LOCAL 170 (hereinafter the "Union") are parties to an agreement extending from October 1, 2024 to December 31, 2024, the collective bargaining agreement, originally entered into on October 1, 2023 and valid through September 30, 2024 (hereinafter the "Collective Bargaining Agreement").

On December 11, 2024, the Union filed a grievance alleging the Employer violated Articles 5, 9, 10 and "all other applicable articles" of the Collective Bargaining Agreement asserting the Marcus Owens (hereinafter the "Grievant"), on or about August 30, 2024, was (1) suspended without just cause, (2) suspended for following documented Company policy and directives, and (3) not afforded due process.  After the Employer denied the grievance, the Union submitted the dispute for resolution pursuant to the terms of the Collective Bargaining Agreement.

The Arbitration hearing was held on March 4, 2025. Each party was provided full opportunity to present evidence, examine and cross examine witnesses, and make arguments.  The following witnesses testified under oath at the hearing:  Samuel Johnson, Employer Program Manager, St. Elizabeth FPS Contract (hereinafter "FPS Contract Manager") for the Employer; Lieutenant E. Barnett, the Supervisor-on-Duty,  on the morning of August 26, 2024 (hereinafter "Lieutenant-B"); Kristin Drury, Contract Telecommunications Supervisor for the Employer, Law Enforcement Operations Bureau, Watch, Warning & Intelligence Division, Campus Security Operations Center[1] Supervisor (hereinafter "CSOC-Supervisor"); D. Baker, CSOC worker (hereinafter "CSOC-Baker"); Kayla Drury, CSOC Project Manager); Cliffton Metaxa, Consellis Operations Director (hereinafter "Employer Operations Director"), and the Grievant.

Post hearing briefs were received on or about April 7, 2025.  At that time, the record was closed.

---

[1] Campus Security Operations Center, referred to hereinafter as "CSOC".

## ISSUE

Was the Grievant terminated for just cause?  If not, what shall be the remedy?[2]

## RELEVANT PROVISIONS

**Article 8.8 – Arbitrable Matters –** The following matters are not arbitrable, and the arbitrator shall have no power and no jurisdiction to: ... (a) add to, subtract from, alter, or in any way modify the terms of this Agreement; ... (f) substitute his or her judgment for that of the Employer in connection with any discipline taken by the Employer against any employee if the facts found by the arbitrator substantially affirm the facts relied upon by the Employer.

**Article 9.1 – Management Rights** – Management of the operations and workforce covered by this Agreement are vested exclusively with the Employer, except as limited by specific provisions of this Agreement.  The Employer shall have sole and exclusive rights customarily reserved to management, including but not limited to, the right to construe this Agreement to limit the Employer's discretion except only as that discretion may be specifically limited by the express terms of this Agreement:...

    b) Discipline employees for just cause;...
    h) Determine and change starting times, quitting times, schedules, shift, and post
       assignments of employees;...
    k) Take any other measures which are reasonable and necessary for the orderly and
       efficient operation of its business;...
    n) Manage, assign, and direct the workforce; ....

**Article 9.2 – Management Rights Retained –** The above right of management are not to be interpreted as all-inclusive, but merely indicate the types of rights which are reserved for management.  Any other rights, powers, or authority the Employer had prior to signing this Agreement are retained by the Employer, except those specifically limited or modified by this Agreement.

**Article 10  – Discipline and Discharge –** Employees shall be subject to discipline or discharge for cause.   Employee's shall be subject to the Employer's "Progressive Discipline Policy."

**Progressive Discipline Policy (in relevant part) –** Outlined below are the steps of Triple Canopy's Progressive Disciplinary Policy.  Triple Canopy reserves the right to combine or skip steps depending on the fact of each situation and the nature of the offense....

---

[2] The Employer, in its post-hearing brief, slightly rephrased the "Issue Presented" to be "Did Triple Canopy have just cause to terminate Grievant? If not, what shall be the remedy?"

5.0 – <u>Termination of Employment</u> – The most serious step in the progressive discipline procedure is a recommendation to terminate employment.  Generally, Triple Canopy will try to exercise the progressive nature of this Policy by first providing verbal counseling, LORs, or suspension from the workplace before proceeding to recommendation to terminate employment.  However, Triple Canopy reserves the right to combine and skip steps depending on the circumstances of each situation and the nature of the offense.  Final termination of employment must be approved by Legal, HR, and the President of North American Operations or his or her designee....

**Progressive Discipline Policy Provisions (in relevant part)**

- <u>Refusal or Failure to Perform Assigned Duties</u> - First Occurrence: "Written Warning"; Second Occurrence: "1-Day Suspension"; Third Occurrence: "2-Day Suspension"; Fourth Occurrence: "Termination of Employment"

- <u>Insubordination</u> - First Occurrence: "Termination of Employment"

**SMART BOOK – Chapter 10 (Misconduct), Section 10.2 (Grounds for Possible Disciplinary Action)**

 The following list comprises grounds for disciplinary action by your employer up to and including removal from any FPS PSO service contract:...

- Disregarding orders, including your post orders, special orders or instructions, or verbal instruction from your SUPERVISOR(S) OR THE COR...
- Insubordination toward visitors, your supervisor(s) or government personnel...
- Negligence-sleeping on duty, abandoning your post without being properly relieved or failing to perform your duties as prescribed...

<strong><u>FINDINGS of FACT</u></strong>

1. Extensive finding of facts regarding the Grievant's conduct during the time he worked overtime, are included as an end note to this award.[i]

2. On July 1, 2020, the Employer entered into a contract with the Federal Protective Services (hereinafter "FPS") to provide services at the St. Elizabeth Campus, in Washington, D.C. (hereinafter the "STE Campus").

3. The STE Campus has the highest security designation; it is a Level 5 facility and has over 200 employees assigned to work at the site.

4. The STE Campus houses the headquarters of both the  U.S. Department of Homeland Security and the U.S. Coast Guard.

5.  The Employer employs Protective Services Officers (hereinafter "PSOs") to provide security services for the STE Campus.

6.  The Employer provides PSOs training on the contents of the "SMART Book" -- a security manual issued by FPS.  The SMART Book describes the PSOs' job responsibilities and provides PSOs notice of prohibited conduct.

7.  PSOs are "frontline" personnel whose responsibility is to ensure the safety of the individuals permitted to enter the STE Campus, as well as the facilities, equipment, property, etc., on the Campus

8.  PSO responsibilities include, but are not limited to, securing the perimeter of the STE Campus, staffing the guard posts, screening individuals who seek access to the campus, checking identification, operating  x-ray and magnetometer equipment, determining whether or not people or vehicles will be allowed to enter the STE Campus, and responding to emergencies.

9.  Members of the Employer's staff who supervise the PSOs, frequently remind the PSOs to be "extra vigilant" when operating barriers to avoid damaging vehicles entering and exiting the STE Campus.

10. Lieutenant-B testified a PSO should not "mess around if you're not feeling comfortable. You should contact your supervisor.  Safety is most important."

11. The Employer stresses safety, and do not want any Officer to work when their abilities are compromised and continuing to work presents a true safely issue.

12. On August 28, 2024, and for some extended period prior to that day, there was a sign displayed in Post 62, stating something to the effect of "YOU MUST PHYSICALLY STEP OUT OF THE BOOTH WHEN OPERATING THE BARRIER.  FAILURE TO DO SO MAY RESULT IN DISCIPLINARY ACTION. IF YOU ARE UNCOMFORTABLE WITH OPERATING THE BARRIER OR REQUIRE ADDITIONAL TRAINING, YOU MUST CONTACT YOUR SUPERVISOR IMMEDIATELY."

13. The Employer did not consider the sign displayed in Post 62 to be an "official" Employer notice.  The FPS Contract Manager testified the sign was a FPS sign.

14. The Employer employed the Grievant as a PSO at the STE Campus in January 2020.  He had been hired by the Employer's parent company, Constellis in 2018.  Prior to this, the Grievant has worked at TSA and other armed security jobs.  He also served in the Army National Guard Infantry for three years.

15.  The FPS Contract Manager testified he found the Grievant to be a "good, reliable employee," and although he did not "show up a few times," the Grievant had a "good attitude" and was a "good worker."

16. Grievant volunteered to work from Sunday, August 25, 2024, at 6 p.m. until Monday, August 26, 2024 at 6 a.m.   He was assigned Post 62/Gate B.

17. The Grievant testified, sometime during this shift, Lieutenant Moses asked if he would be able to work until 10 a.m. because a number of scheduled PSOs had called out. The Grievant declined the offer.

18. When the Grievant was calling the Campus Security Operations Center (hereinafter "CSOC"), on the morning of Monday, August 26, 2024, between approximately 6:18 a.m. and 6:55 a.m., CSOC-Supervisor Drury, CSOC-Jones, and CSOC-Baker (collectively hereinafter, the "CSOC Staff") were working in the CSOC office.   The three employees did the same job, but Drury was the supervisor.

19. All calls to the CSOC are answered on speaker.  The CSOC Staff present on the morning of August 26, 2024 heard each of the calls placed by the Grievant.

20. CSOC-Jones did not testify during the hearing, although he spoke with Grievant, at least twice that morning.   One of these calls was in progress, when Lieutenant-B called and CSOC-Supervisor, on August 26, 2024, at approximately 6:52 a.m.

21. The CSOC contains a "Smart Wall," comprised of monitors connected to security cameras covering each post location, including Post 62, and nearly all other area of the STE Campus.

22. All security camera on the STE Campus belong to and are operated by the CSOC, not the Employer.  There are several cameras located in and outside of Post 62.   One of those is fix on the barrier.  The camera "are not the best" quality cameras.

23. The Employer's PSO Supervisor regularly remind the PSO to operate the barriers safely. Officers who were uncomfortable operating the barrier due to 'their circumstances, hours worked, etc., were required to report this to 'Management' so that relief could be provided, as the Company did not want an Officer to continue to operate the barriers, risking damage to automobiles and injuries to occupants.

24. Accordingly, the Grievant's decision to report his concerns about his ability to work safely were not unreasonable, if he was exhausted and believed he could perform his job safely.

25. At approximately 6:18 a.m., on August 26, 2025, the Grievant called CSOC for the first time.  He spoke with CSOC staff member Jones (hereinafter "CSOC-Jones"), and requested FPS respond to his location claiming he was tired, not feeling safe with his weapon, and did not feel comfortable working the barrier.

26. The CSOC-Supervisor's contemporaneous notes, written August 26, 2024, (hereinafter, "CSOC-Supervisor-Contemporaneous-Notes") reflect this is what the Grievant said during his first call to CSOC that morning.

5

27. The Grievant called CSOC two more times before CSOC-Supervisor called Lieutenant-B, as directed by the Inspector. The times these two calls to CSOC occurred are not in evidence.

28. During these two calls, the Grievant repeated his concerns to CSOC-Staff. One of the CSOC-Staff members present took the call and "advised [him]that he needed to speak with his supervisor (as the Inspector had told CSOC-Supervisor) and FPS stated they could not assist him ...."

29. CSOC-Supervisor-Contemporaneous-Notes state, in relevant part, after CSOC received this call from the Grievant, "she "notified" FPS Inspector D. Williams (hereinafter "Inspector") of the situation.

30. The evidence does not indicate how and when the CSOC-Supervisor "notified" the Inspector about the Grievant's repeated calls to CSOC.

31. The evidence does not indicate how or when the Inspector "stated" or "advised" the CSOC-Supervisor the Grievant "needed to speak with his "supervisor."

32. The evidence does not indicate if the Inspector "advised" or "stated" CSOC-Supervisor should call the Armory and ask for Lieutenant-B, specifically, or to call ask to speak with whoever was the shift supervisor.

33. The Grievant called CSOC two more times before CSOC-Supervisor called Lieutenant-B, as directed by the Inspector. The times these two calls were received by CSOC are not in evidence.

34. On these two calls, the Grievant repeated his concerns to CSOC-Staff. One of the CSOC-Staff members present took the call and, again, advised he needs to speak with his supervisor [as the Inspector had told CSOC-Supervisor] and FPS could not assist him ...."

35. Instead of contacting CSOC repeatedly, he should have contacted his supervisor especially after the CSOC staff told him to do so and that FPS could not assist him.

36. No testimonial or documentary evidence, including but not limited to, the CSOC-Supervisor-Contemporaneous-Notes or Lieutenant-B's Disciplinary Incident Report, written on August 26, 2024, (hereinafter "LTB Incident Report"), establishes what time CSOC-Supervisor spoke with Lieutenant-B on August 26, 2024 about what the Grievant said to CSOC Staff Members during his repeated calls that morning.

37. CSOC-Supervisor-Contemporaneous-Notes state, in relevant part, (1) "Lt. Barnett was contacted and made aware of the situation...," and that "Lt. Barnett was notified by [CSOC Supervisor] of PSO Owens calling in CSOC numerous times about his situation and that CSOC has advised him of the same results." (Emphasis added.)

38. The LTB Incident Report states, in relevant part, "On Monday, Aug. 26th, around 0645, the Armory received a call from the CSOC Supervisor stating that [the Grievant] refused to allow CW employees pass your gate, by not lowering the barrier...."

39. Neither the CSOC-Supervisor-Contemporaneous-Notes nor the LTB Incident Report says say the CSOC-Supervisor called and asked to speak with Lieutenant-B.

40. Neither the LTB Incident Report nor Lieutenant-B's testimony clarifies how Lieutenant-B was alerted the CSOC-Supervisor had called the Armory and left information regarding the Grievant repeatedly calling CSOC  and stating his concern about his diminished capacity to work safely.

41. CSOC-Supervisor did not testify she spoke with Lieutenant-B or anyone else when she called the Armory or if she left a voicemail message.

42. The CSOC-Supervisor-Contemporaneous-Notes do not indicate she talked with Lieutenant-B or any other person or left a voicemail message when she called the Armory.

43. The evidence does not establish precisely who the CSOC-Supervisor was attempting to contact when she called the Armory or what message she left and how she left it.

44. The evidence does not specify how the CSOC-Supervisor "notified" Lieutenant-B about the Grievant's repeated calls to CSOC, after she received feedback from the Inspector.

45. It is unclear from the evidence what time and how Lieutenant-B became aware CSOC-Supervisor had called the Armory,  the reason for her call, and the information she left about the Grievant being tired and not confident he could perform his job.

46.  Taken together, testimony from CSOC-Supervisor and Lieutenant-B, and relevant statements found in the LTB Incident Report and CSOC-Supervisor-Contemporaneous-Notes, indicate when CSOC-Supervisor called the Armory, around 6:45 a.m., she (1) did not speak with Lieutenant-B and (2) left a message explaining why she had called the Armory, requesting the appropriate supervisor contact her to discuss the situation regarding the Grievant repeatedly calling her office.

47. The evidence indicates the message left when she called the Armory described the specific concerns the Grievant expressed CSOC Staff during his four or five repetitive calls – he was tired, could not operate the barrier, and concerned about handing his service weapon.

48. Lieutenant-B's call to CSOC, at approximately 6:52 a.m., was in response to the CSOC-Supervisor's call to the Armory to make contact with the relevant supervisor, as the Inspector "advised" her to do.

49. Lieutenant-B did not write, in the LTB Incident Report, the time he called CSOC and spoke with CSOC-Supervisor.

50. CSOC-Supervisor-Contemporaneous-Notes state Lieutenant-B called CSOC and spoke with CSOC-Supervisor around 6:52 a.m. on August 26, 2026.

51. The evidence indicates, before Lieutenant-B called CSOC and spoke with CSOC-Supervisor, he had somehow and at some point, received the message CSOC-Supervisor she left when she called the Armory because (1) CSOC-Supervisor testified, when they spoke, Lieutenant-B stated he was aware of the Grievant's concerns but there was nothing he could do and (2) at that time, Lieutenant-B spoke with CSOC-Supervisor, had not yet spoken with the Grievant.

52. According to the CSOC-Supervisor-Contemporaneous-Notes, the Grievant was on the phone with CSOC Staff Member Jones when Lieutenant-B called CSOC at 6:52 a.m. (CSOC Staff Member Jones did not testify at the arbitration hearing.)

53. The evidence does not indicate how the CSOC-Supervisor "notified" Lieutenant-B about the Grievant's repeated calls to CSOC, after she received feedback from the Inspector.

54. The evidence does not indicate the time or method by which Lieutenant-B was "notified" about, i.e., actually received the information the CSOC-Supervisor reported to the Armory about the Grievant's conduct on the morning of August 26, 2024.

55. The evidence indicates Lieutenant-B called the Grievant, on August 26, 2024, after he finished his call with CSOC-Supervisor; however, the evidence does not establish what exact time Lieutenant-B and the Grievant spoke to each other that morning.

56. Lieutenant-B did not note the time he called the Grievant in the LTB Incident Report.

57. The call between Lieutenant-B and the Grievant took place sometime after 6:52 a.m.

58. This was the only time on August 26, 2024, the Grievant and Lieutenant-B spoke.

59. During their phone call, Lieutenant-B and the Grievant were not rude or disrespectful during the conversation. Nor did Lieutenant-B act in a hostile manner.

60. Lieutenant-B testified, during this conversation he told the Grievant "he needed to drop" the barrier because the CSOC-Supervisor "called him" and said they could see cars "backing up" at the gate. He also testified, "Mr. Owens did not lower the barrier after being told to do so."

61. LTB Incident Report, dated August 26, 2024, states, in relevant part: On Monday, Aug. 26th, around 0645 the Armory received a call from the CSOC Supervisor stating that [you] refused to allow CW employees pass your gate, by not lowering the barrier. I then called and asked you, "Why are you not lowering the barrier[?]". [Y]ou stated that 'You

did not feel comfortable[.]'  I then advised you to lower the barrier for the CW employees and you refused....."

62. The Grievant did not ask Lieutenant-B to provide him assistance to get from Post 62 to Building 49, the "Armory," during their phone conversation on August 26, 2024.

63. The Grievant was relieved from duty, at some time after 6:53 a.m.

64. The Grievant wrote in his Correction Letter, dated August 31, 2024, in pertinent part: (1) he called and spoke with Lieutenant-B at approximately 6:30 a.m., on August 26, 2024; and that (2) during the purported call he (a) stated his concerns with being "held over" because he felt exhausted and was not comfortable operating the barrier and (b) read "verbatim" the sign that hangs in his Post 62.  The Grievant also wrote in his Correction Letter, Lieutenant-B "provided various time ranging from 7:00 a.m. to 10:00 a.m. after the Grievant asked him when he would be relieved from his post.

65. If the Grievant called Lieutenant-B on August 26, 2024, he did not reach him and have that alleged conversation.  The Grievant, however, did speak with two other Lieutenant's that morning about  whether he could work four hours of overtime and when he could expect to be released from overtime duty.

66. Lieutenant-B testified PSO D. Young relieved the Grievant on August 26. 2024. She signed in on the "RECORD OF TIME OF ARRIVAL AND DEPARTURE CONTRACT GUARDING DUTY REGISTER" at 7:00 a.m.

67. Lieutenant-B testified the Grievant was the first of three PSO who had been held over, on the morning  of August 26, 2024, to be relieved "because he was not doing his job."

68.  The "GUARD EQUIPMENT CONTROL REGISTER" contained in the ROI entered into evidence list names of individuals who were issued a firearm at approximately 5:35 p.m. on  August 25, 2024 and returned firearms at 6:00 a.m. on August 26, 2024.

69. Although, there is testimony the Grievant went to the Armory and returned the  service fire arm he was issue when he began his shift on August 25, 2024, at 6:00 p.m., there is no "GUARD EQUIPMENT CONTROL REGISTER" in evidence stating when the Grievant returned his firearm.

70. The Grievant testified he called his Union President on the morning of August 26, 2024. The Grievant claims the Union President told him to call CSOC and his supervisor.   The Grievant asserts the Union President also told him to continue doing his job.

71. The Grievant testified he believed PSOs are supposed to call CSOC to let FPS know when they are tired.

72. The Grievant testified he "got relief after 12 minutes." He then walked to the Armory, turned in his service weapon.

73. The "Record of Time of Arrival and Departure Contract Guarding Duty Register" shows the Grievant signing out at 7:00 a.m.

74. On Tuesday, August 27, 2024, Steven Munhall, Protective Security Operations Officer, FPS (hereinafter "PSOO-FPS") sent an email to Employer Operations Director (Metaxa) and David Plaska, who also was employed by Consellis.  The PSOO-FPS email request them to develop an action plan, due by August 30, 2024, in response to the CSOC-Supervisor's statement regarding the Grievant's conduct on August 26, 2024.

75. In his email, the PSOO-FPS listed the provisions of the SMART Book he believed may have been violated by the Grievant on the morning of August 26, 2024 – disregarding orders; insubordination; negligence (failing to perform your duties as prescribed); improper use of official authority, credentials, or equipment; and unreasonable delays or failure to complete job assignment ... refusing to assist someone as required in your post orders.

76.  Although the Employer had started looking into the Grievant's conduct when he was working the hour of overtime on August 26th, this request, on August 27th, to investigate the incident and the deliver an action plan to the FPS-Protective Services Operations Officer by August 30th, required the Employer to accelerate its investigation.

77.  Although the Employer was working to develop the requested action plan, and there are a number of surveillance cameras monitoring a variety of views inside and outside of Post 62, including one fixed on the barrier, the Employer decided not to request any video from FPS.

78. The surveillance video is only available for 14 days.

79. The FPS Contract Manager complete the Investigation Report, on or about August 30, 2024. Employer Operations Director received a copy of the Investigation Report prepared by the FPS Contract Manager.

80. The Employer Operations Director testified, after reviewing the Investigation Report, he was convinced the Grievant had violated the insubordination provision of the Employer Progressive Discipline Policy because he believed the evidence established the Grievant simply refused to follow a direct order from Lieutenant-B Barnett to lower the barrier at Post 62.

81. On Friday, August 30, 2024, the FPS Contract Manager met with the Grievant.  During the meeting, the FPS Manager handed the Grievant a copy of an "Appendix No. 4,"the LTB Incident Report, completed by Lieutenant-B, on Monday, August 26, 2024.  The report stated, in relevant part, "On Monday, Aug. 26th, around 0645, the Armory received a call from the CSOC Supervisor stated that [you] refused to allow CW employees pass your gate, by not lowering the barrier.  I then called and asked you,

"Why are you not lowering the barrier." You stated that "You did not feel comfortable." I then advised you to lower the barrier for CW employees and you refused. Please see attachment for further details for CSOC Supervisor." (The attachment referred to was the CSOC-Supervisor-Contemporaneous-Notes.)

82. The FPS Contact Manager also gave the Grievant a copy of "Appendix No. 5 – Memorandum – Removal from the Schedule Pending Outcome of Investigation," dated August 30, 2024. The Memorandum stated the Employer "received written notification from FPS stating that on the morning of 26 August 2024, while assigned to Post 62 between 0600-0700 PSO Marcus Owens willing and knowingly disregarded FPS post orders. As a result of these allegations, you are being removed from the working schedule effective 30 August, pending the outcome of the investigation."

83. On Saturday, August 31, 2024, at 9:21 a.m., in response to what he and the FPS Contract Manager discussed and documents shared the day before, the Grievant sent the FPS Contract Manager an email (hereinafter, "Clarification Email") explaining his recollections of the events of August 26, 2024, in order to provide a clear account of my actions on that day."

84. The Clarification Email states, in relevant part: (1) At 6:08 a.m., "I contacted Building 49 [the "Armory"] to inquire about my relief. LT. Jones informed me that they were looking into it and would call me back. Shortly after, I received a call from "Lt. Moses, who offered me additional hours. I declined the offer, as I had already completed a 12-hour shift;" (2) At 6:20 a.m., the Grievant contacted CSOC and requested support. The CSOC directed him to contact his Lieutenant; (3) there is a notice posted inside Post 62, and all barrier posts, stating , in relevant part, "[i]f you feel uncomfortable and need more training, you should reach out to your supervisor immediately;"[3] (4) The Grievant followed the sign's directive and "contacted [Lieutenant-B ] to ask when I would be relieved from my post. He provided various times ranging from 10:00 to 07:00. I explained that I needed to be relieved and that I did not feel comfortable continuing to work the barrier without assistance, as per the posted instructions...;" (5) Lieutenant-B responded to him in a "hostile manner"; and (6) "at about 0635, a CW worker arrived at the gate. After a brief conversation, the worker left and chose to walk through Trailer B."; (7) At approximately 0645, Lt. Barnett called me again, still in a hostile tone, question why I had not lowered the barrier. I explained that there was no one at the gate and reiterated that I needed assistance with the barrier, as I was uncomfortable and had followed proper protocol by informing my supervisor."; (8) The Grievant was relieved of duty around 7:00 a.m.

85. After the FPS Contract Manager received the Clarification Email, no Employer representative ever contacted the Grievant to discuss his assertions.

---

[3] The Grievant testified that during this conversation with Lieutenant-B, he read the entire sign displayed in Post 62 to Lieutenant-B "verbatim."

86. The Employer Operation Director drafted the Termination Letter, dated October 9, 2024 (hereinafter "Termination Letter") received by the Grievant. The Termination Letter, stated, in relevant part, the Grievant was being discharged "for violating the Constellis Progressive Disciplinary Policy, Insubordination. In that on August 25 (sic), 2024, you refused to lower the barrier for personnel entering the St. Elizabeths (sic) campus and refused an order to perform your assigned duties."

87. The Employer Operations Director, before making his decision to impose the penalty of termination for insubordination, did not: (1) meet with the Grievant; (2) consider whether or not the Grievant had any prior discipline; (3) review any video; (4) know if the CW contractor provided information about what occurred at Post 62 on August 26, 2024; (5) consider the sign displayed in Post 62 to be an official FPS notice, but he reviewed and considered the copy provided by the Grievant; (6) look into the Grievant's employment background; (7) know how long the Grievant worked for the Employer; (8) follow up with the Grievant regarding his Clarification Email.

## EMPLOYER POSITION

The Employer argues it has satisfied its burden to establish by "a preponderance of the evidence" just cause existed to terminate the Grievant's employment for "insubordination." It contends, the Grievant's "refusal to lower the barrier after being ordered to do so by [Lieutenant-B] was in direct contravention of SMART Book directives and Company policy."

Specifically, the Employer contends "the record supports discharge as the appropriate penalty for Grievant's insubordination in a refusing a direct order from [Lieutenant-B] to lower the barrier." It argues, "[a]rbitrators uniformly agree that the employer had the right to establish and enforce" rational and reasonable work rules "related to a legitimate business objective."

The Employer emphasizes it takes insubordination seriously. It has issued a disciplinary policy and SMART Book provisions sanctioning insubordination. It notes, "it is a clear rule, ... reasonably related to the Company's legitimate business objective in safeguarding federal facilities," and the penalty for the "first offense" is termination.

The Employer argues, "to permit employees to willfully disregard a direct order would result in chaos." The Employer asserts the Grievant attempted to hold them "hostage by effectively prohibiting vehicle traffic between secured and non-secured areas" of the STE Campus, a Category 5 federal facility. It also contends, "[a]rbitrators are loathed to second-guess discipline issued for an employee's refusal to work required overtime."

Regarding the specific alleged misconduct, the Employer argues the Grievant failed to lower the barrier numerous times while working mandatory overtime the morning of August 26, 2024. It introduced documentary and testimonial evidence from three employees who worked in the STE Campus Security Operations Center, who spoke with and witnessed the Grievant's conduct during the relevant timeframe.

The Employer asserted these individuals "harbored [no] animus toward the Grievant and "no reason" to "testify falsely," and "were simply doing their jobs...." The Employer noted, these witnesses, collectively, "saw three vehicles turned around from the barrier" and "did not see Grievant lower the barrier for any vehicles between 6:00 a.m. and 7:00 a.m."

The Employer argues that Lieutenant-B, who did not work the 6:00 p.m. to 6:00 a.m. shift with the Grievant, and was not his regular supervisor, harbored no animosity towards the Grievant. It notes, Lieutenant-B sent the first available PSO who reported to relieve the Grievant at 7:00 a.m., after he and two other PSOs were "held-over" because multiple PSO schedule to work the 6:00 a.m. to 6:00 p.m. shift, on August 26, 2024, "called-out."

The Employer questions the Grievant's credibility. It established the Grievant's testimony regarding "working an extra shift over the weekend" was false. It also notes the Grievant did not report he was unable to safely operate the barrier until after he had been informed he was being held over to work mandatory overtime.

The Employer asserts the "myriad of excuses and/or justifications for [the] Grievant refusing to obey a direct order to lower the barrier...," to simply be a "red herring." The examples cited by the Employer include, but are not limited to, the Grievant: (1) was tired and unable to safely operate the barrier after working 36-hours in three days; (2) followed instruction on a sign in Post 62 stating to immediately contact your supervisor if you are uncomfortable operation barrier; (3) never refused to lower the barrier for a vehicle; and (4) did lower the barrier for two vehicles while being held over. The Employer also challenges the Grievant's contentions (1) the Employer's investigation was faulty and (2) defying a direct order is not insubordination; instead, it should be considered a failure to perform assigned duties.

The Employer questions whether the Grievant actually was exhausted and unable to safely lower the barrier. It contends the Grievant was not too tired to safely "press a button" to operate the barrier because the Grievant was able to: (1) use his phone and make "at least four" calls to his Union Representative and the CSOC; (2) walk, without assistance, to the Armory; (3) perform the dangerous task of clearing and turning in his weapon; and (4) walk to his vehicle and drive home.

The Employer asserts the Grievant's claim the CW contractor who drove up to the barrier was not seeking be let through "defies logic" because once he was required to park, he walked through the trailer to go to the other side of the campus. It questions the Grievant's inability to recall his conversation with the contractor and why the contractor would have driven up to the barrier, at all, if his intention was not to gain access to the campus in his golf cart.

## UNION POSITION

The Union asserts the Employer has a "heavy burden" to prove it had just cause, in accordance with the terms of the Collective Bargaining Agreement, to discharge the Grievant.

The Union argues to satisfy this burden, the Employer must demonstrate: (1) the Collective Bargaining Agreement permits it to discharge the Grievant for the reasons cited in the Termination Letter and (2) the Grievant's actions, in fact, violated the cited conduct rule.

The Union, specifically, argues the Employer failed to (1) prove the Grievant's conduct violated the standard cited in the Termination Letter, (2) provide Grievant his fundamental due process rights by failing to (a) conduct a proper investigation, (b) notify the Grievant "his conduct would lead to discharge," and (c) treat him fairly; and (3) impose a reasonable penalty "related to the seriousness of the offense(s)."

The Union notes the reason the Employer provided for discharging the Grievant was for violating the "Insubordination" provision of the Constellis Progressive Disciplinary Policy after he refused to (1) lower the barrier for personnel and (2) comply with an order from his supervisor to perform his assigned duties.  It claims the Employer must prove the Grievant engaged in conduct that violated these requirements. The Union, citing various arbitration awards,  claims, when an Employer relies on multiple rule violations to sanction an employee "its burden of proof obligates it to prove each charged offense."

Regarding the allegation the Grievant violated the Insubordination provision, the Union claims the Grievant "never stopped doing his job," and, therefore, did nothing wrong that should subject him to any discipline.  It also argues the Grievant "complied with posted Orders" when he informed his managers that he was not comfortable working beyond the end of his scheduled shift. The Union assert the Employer trained the Grievant not to operate the barrier "if he felt he was unable to do so safely."

The Union asserts the Employer failed to prove the Grievant refused to lower the barrier for personnel entering the STE campus.  First, it claims the maintenance worker who was heading to the trailer located near the gate, opted not to pass through the barrier; electing to drive to the trailer, park, and walk inside the trailer.  The Union argues the Employer did not prove the Grievant refused to lower the barrier because it declined to (1) speak with either the maintenance worker or the Grievant about this incident and (2) "secure the camera footage that would have confirmed the events."

Additionally, the Union argues the Employer has failed to prove the Grievant refused an order to perform assigned duties. The Union claims the Employer gave the Grievant a single order soon after the maintenance worker left.  The Union states  when Lieutenant-B called the Grievant and asked him to lower the barrier, the Grievant responded there was no one at the barrier trying to enter, and Lieutenant-B responded ok.

The Union argues the Grievant did nothing "that should have subjected him to discipline, let alone discharge." It contends the Employer communicated, directly or indirectly,  to the Grievant he should report to an Employer's representative when he believed he could not safely operate the barrier.  It argues, the Employer "cannot post "Orders," or "permit the Orders to be posted" directing its employees to report they are "too fatigued" to operate the barrier safely and "then terminate the Officer for following the directive."   Additionally, the Union argues, "even if [the Grievant] had placed compliance

14

with the posted Order and safety over allowing a driver to pass through a gate...," that could not be a dischargeable offense."

The Union asserts the Grievant "continued to perform all duties until he was relieved." It contends the Grievant never refused to operate the barrier.

The Union claims an adverse inference must be drawn from the failure of the Employer to secure video evidence regarding the events in or around the Grievant's post on the day in question. It contends the Employer's explanation for not securing the video – that the contractor had no obligation to participate in the investigation – was absurd. The Union posits the contractor "would have provided an explanation of what happened."

The Union argues "an established rule of evidence" requires an arbitrator to "draw a negative inference when a party fails to produce evidence under its control.[4] The Union claims this rule requires an inference "the camera footage would have supported the Grievant's assertion his actions did not constitute misconduct." The Union, also, contends the Employer's failure to speak with the maintenance contractor who parked in an area outside the barrier, creates a negative inference that the Grievant did not prevent the maintenance contractor from passing through the gate.

The Union argues disciplinary action must meet the "requirements of industrial due process before an arbitrator will find that it was for proper cause." The Union asserts "due process cannot be established" because the Employer's investigation was inadequate or non-existent. It claims the Employer deprived the Grievant of due process when it (1)"pre-determined" his guilt; (2) failed to obtain security camera footage; and (3) did not speak with the maintenance CW contractor ("the alleged victim") or the Grievant about what transpired. The Union describes the maintenance contractor to be the "only person," besides the Grievant "who had first-hand knowledge of what occurred." The Union argues a just cause finding is not possible in this dispute because the Employer did not interview the maintenance contractor.

The Union asserts the Employer denied the Grievant "fundamental fairness" and his "due process rights" because it did not tell the Grievant the "specific charges" against him or offer him a "reasonable opportunity" to defend himself. It claims, such Employer conduct "precludes a finding of just cause."

---

[4] The cited provision reads, "The <u>failure of a party</u> to call as a witness a person who is available to it and who should be in a position to contribute informed testimony may permit the arbitrator to infer that had the witness been called, the testimony adduced would have been adverse to the position of that party. Where an employer failed to have the single accusing witness appear, however, the arbitrator expressed concern because of the accuser's absence and found insufficient evidence to support the employee's discharge.")(Emphasis added)(Citations omitted). See, Elkouri & Elkouri, How Arbitration Works, 6th ed. 2003, pp. 381-382.

The Union argues the Employer must "not only prove each element of the alleged misconduct but also that the penalty imposed was justified." (Citations omitted.). The Union contends the burden of proof in this case is "clear and convincing evidence." The Union asserts the Employer has failed to satisfy this burden.

The Union argues that if the Employer was able to establish the Grievant refused an order to perform assigned duties, the penalty would only be a written warning. It contends even if the Employer can establish the Grievant did not follow an order when he declined to lower the barrier, it failed to prove that termination was the appropriate penalty in this case.

The Union asserts the Employer cannot establish just cause because it "failed to follow its' own policies regarding the penalty for the conduct at issue...." It contends the policy the penalty for failing to orders is a "written warning." Specifically, the Union argues the imposed penalty was not reasonable. It also asserts the fact the Employer failed to consider the Grievant's "commendable employment record" precludes a finding of just cause, as well.

The Union requests (1) the grievance be granted, (2) the Grievant's discharge be overturned, and he be restated with "full seniority, back bay and benefits paid for the time he was improperly out."

## DISCUSSION

The issue in this case is: Was the Grievant terminated for Just Cause? If not, what shall be the remedy? More precisely, the issue is "Did the Employer have just cause pursuant to the Collective Bargaining Agreement when it terminated the employment of the Grievant for violating the Insubordination provision of the Employer's Progressive Disciplinary Policy? If not, what shall be the remedy?"

The Employer bears the burden of proof in this disciplinary case. It must present clear and convincing evidence to prevail.

Arbitrators are frequently troubled both when determining what constitutes the appropriate burden and in determining whether it has been met. Probably the most crucial aspect of providing due process under the just cause standard is deciding whether the employer has provided sufficient proof for the arbitrator to endorse its action. In razor's edge cases, the burden of proof standard resolves the case. If the employer had not proven the infraction occurred, the employee is exonerated. The employee may have been guilty, but to punish an employee for a possible or even a probable wrong, without convincing proof, runs the risk of penalizing an innocent employee. That would violate just cause precepts. If the employee is, in fact, guilty, but guilt is

unproven, the employee may profit from the scrape with discipline, and reform.[5]

The arbitrator, therefore, must review carefully the evidence presented to determine whether the disciplinary action taken was appropriate.  In performing this duty, an arbitrator must thoroughly examine the record to decide whether the weight of the evidence supports a finding the employee, in fact, violated the conduct standard or standards for which the discipline was imposed.

After a comprehensive consideration of the entire record, including all the evidence introduced and arguments made by the respective parties; recognizing the Employer is responsible for securing and protecting the individuals and property of this Level 5 facility; and that insubordination is among the most serious conduct violations, for the following reasons, the grievance is granted.

The Employer states, "this is a straight forward case.  At issue is whether the Grievant ... committed insubordination when he refused a direct order to lower a vehicle barrier at a security post he was manning – resulting in multiple vehicles being turned away from the main access point between the secured and unsecured areas of the [STE Campus] in Washington, D.C.  Insubordination is the refusal by an employee to work or obey an order given by the employee's superior.  To permit an employee to willfully refuse a direct order would result in chaos." The Union, also, argues this is a simple case; it claims, in part, the Grievant "never stopped doing his job."

The Termination Letter states the Grievant violated "the Constellis Progressive Discipline Policy, Insubordination."  It also states, in pertinent part, "on August 25, 2024 (sic) you refused to lower the barrier for personnel entering the St. Elizabeths (sic) campus and refused an order to perform your assigned duties."   The Employer claims it "carried its burden," i.e.,  to prove by a "preponderance of the evidence," the Grievant refused to lower the barrier, "after being ordered to" by his superior.  It contends the Grievant's refusal directly contravened  SMART Book directives and Company policy**.**

The Employer's Progressive Disciplinary Policy does not include a definition of the term "insubordination".  However, the Employer provides PSOs training on the SMART Book, which includes "Grounds for Possible Disciplinary Action."  The potential disciplinary action under that section includes, in pertinent part, (1) "[d]isregarding orders ... or verbal instructions from your supervisor(s) ..." and (2) "[i]nsubordination toward visitors, your supervisor(s) or government personnel."  Additionally, "insubordination" generally has been

---

[5] See Just Cause, Chap. 14, §14.03[2] – Just Cause for Discipline, p. 14-9, Arnold Zack, Labor and Employment Arbitration (LexisNexis), Second Edition (Bornstein, Gosline, Greenbaum, and Mayberry, General Editors).

defined as 'a willful disregard of express or implied directions of the employer and refusal to obey reasonable orders."[6]

It is axiomatic that all claims of insubordination have as a factor some type of misconduct, whether acts of commission or omission. In addition, insubordination claims have an indispensable temporal-relationship consideration. For an insubordination claim to be successful, the evidence must establish the employee violated a legitimate order received from a supervisor, after the employee received the order. If there is insufficient evidence to establish the alleged misconduct occurred after the order was issued, insubordination cannot be found to have occurred.

According to the Employer's Post-Hearing brief, and based on the alleged violations cited in the Termination Letter, the relevant timeframe to examine for evidence of the Grievant's alleged insubordination is Monday, August 26, 2024 from, approximately, 6:18 a.m. (when the CSOC Staff Members received the first call from the Grievant) and 6:53 a.m. (when Grievant was released from duty). In reviewing evidence presented regarding the Grievant's conduct during this, approximately 45-minute period, two critical questions must be answered: (1) When did Lieutenant-B order the Grievant to operate the barrier when vehicles containing a person or persons authorized to enter have attempted go through the checkpoint at Post 62? and (2) Whether, after receiving Lieutenant-B's order, the Grievant did not "drop" the barrier when such a vehicle sought to be let through the checkpoint?

To prove the Grievant was insubordinate, the Employer offered evidence provided by (1) the CSOC Staff Members who, collectively, witnessed the Grievant's conduct and statements; (2) Lieutenant-B who spoke directly to CSOC-Supervisor and the Grievant; (3) FPS Contract Manager, who conducted a prompt investigation; (4) the Employer Operations Director who issued the Termination Letter, and (5) the Grievant. Although there are multiple surveillance cameras located in and outside of Post 62, including one fixed on the barrier, the Employer did not acquire or submit any video evidence of what occurred at Post 62 during the relevant timeframe.

Regarding the "misconduct" consideration of the insubordination claim, clear and convincing evidence demonstrates the Grievant did not perform an essential part his job – operating the barrier – three times while he worked overtime on the morning of August 26, 2024.

Regarding the "temporal" aspect of the Grievant's purported insubordination, Lieutenant-B testified he "advised" the Grievant to lower the barrier after calling CSOC-Supervisor. There is no evidence indicating, specifically, when Lieutenant-B gave the Grievant the order to lower the barrier in accordance with his job responsibilities.

---

[6] See Common Causes of Discipline, Steven J. Goldsmith and Louis Shuman, Chapter 16, §16.04[1] (Insubordination - Definition), Labor and Employment Arbitration (LexisNexis), Second Edition (Bornstein, Gosline, Greenbaum, and Mayberry, General Editors).

Lieutenant-B did not record the time he made that phone call to the Grievant and gave him the order (or the phone call to CSOC-Supervisor) in his LTB Incident Report, dated August 26, 2024. Nor did Lieutenant-B offer testimony establishing when he spoke with the Grievant (or ended his 6:52 a.m. call with CSOC-Supervisor). There was no testimony or evidence offered to contradict the time Lieutenant-B called CSOC-Supervisor was 6:52 a.m.

The LTB Incident Report states, in pertinent part, "On Monday, Aug. 26th, around 0645 the Armory received a call from the CSOC Supervisor stating that [the Grievant] refused to allow CW employees pass your gate, by not lowering the barrier...." There is no evidence establishing when, precisely, Lieutenant-B called the Grievant and ordered him to "drop" the barrier. While he mentions the time "the Armory" received a call, he says nothing about when he called the Grievant to issue the order.

The most relevant evidence presented related to establishing the time Lieutenant-B issued his order is CSOC-Supervisor-Contemporaneous-Notes and the CSOC-Supervisor's testimony on the subject.[7] That evidence indicates before calling the Grievant, Lieutenant-B has a conversation with CSOC-Supervisor at, approximately 6:52 a.m. It is not clear in the record how long that conversation lasted, but her notes state the Grievant was on the phone with her office at the time, stating he would not drop the barrier ...."

Her note continued that "it was starting to get backed up." It is not clear if the CSOC-Supervisor was stating CSOC staff was observing cars backing up at that time or if the Grievant purportedly made that comment. Regardless, at that point, Lieutenant-B had not ordered the Grievant to begin dropping the barrier.

There is substantial evidence the Lieutenant order the Grievant to lower the barrier. Upon close examination, however, there in not clear and convincing evidence establishing the time Lieutenant-B made the Grievant aware of the order. The Grievant's testimony confirms he received Lieutenant-B's order. The Grievant also testified, at the time he received the order, he told Lieutenant-B there were no vehicles at the checkpoint. Although much of the Grievant's testimony and recollections of events are clearly not accurate, the is no reliable evidence establishing the Grievant's testimony on this critical point is not accurate.[8]

---

[7] Importantly, the Employer consciously opted not to obtain video evidence that would have likely been dispositive on the issue of what occurred and when at Post 62, while the Grievant was "held over" to work overtime.

[8] The Grievant testified when Lieutenant-B ordered him to lower the barrier for the CW employee, the CW employee had already left Post 62. According to the CSOC Staff's testimony, the three vehicles they saw at the barrier all drove away at some unspecified time. According to CSOC-Supervisor's notes regarding the events she and her staff witnessed that morning, between approximately 6:18 a.m. and 6:52 a.m., the CW-Golf Cart was the first to depart, apparently, sometime prior to 6:49 a.m.

There is no question the Grievant failed, multiple times on the morning of August 26, 2024, to perform an essential job duty -- lowering the barrier at the appropriate time for individuals authorized to pass through the checkpoint. The evidence establishes, without a doubt, he did not perform this duty as required before Lieutenant ordered him to do so.[9] Evidence of that failure, however, is not all that is needed to conclude he was insubordinate.

For the Grievant to be found to have violated the Insubordination Policy, the evidence must be clear and convincing he failed to lower the barrier for a vehicle authorized to pass the checkpoint, "after" Lieutenant-B ordered him to do so, between approximately 6:46 a.m. and approximately 6:52 a.m., when the Employer says he was relieved of overtime duty. After a deliberate review of all of the evidence, the undersigned concludes there is insufficient evidence to prove the Grievant refused to follow Lieutenant's order after he received it. In light of these determinations, the grievance must be granted.

Sometime after Lieutenant completed the 6:45 a.m. call from CSOC-Supervisor. Lieutenant-B called and spoke to the Grievant. Lieutenant-B's Disciplinary Incident Report does not state exactly what time this call occurred. The Report does say, he asked, "[w]hy are you not lowering the barrier[?]..." and the Grievant responded, "[he] did not feel comfortable." Lieutenant-B also wrote, "I then advised you to lower the barrier for CW employee and you refused...."

The Grievant testified that when Lieutenant-B ordered him to lower the barrier for the CW employee, the CW employee had already left Post 62. Although, much of the Grievant's testimony is not credible, there is insufficient evidence to conclude his testimony on this point is not accurate. According to the CSOC Staff's testimony, the three vehicles they saw at the barrier all drove away at some unspecified time. According to CSOC-Supervisor's notes regarding the events she and her staff witnessed that morning, between approximately 6:18 a.m. and 6:52 a.m., the CW-Golf Cart was the first to depart, apparently, sometime prior to 6:49 a.m.

---

[9] The CSOC Staff Members provided substantial, credible testimonial and documentary evidence regarding their interactions with and observations of the Grievant's conduct. Collectively, they participated in, and/or heard as many as six calls from the Grievant. During each call, the Grievant stated, in effect, he did not feel safe operating the barrier and would not do so. He also stated he did not feel safe handling his weapon.

The evidence from the CSOC Staff proves they witnessed (1) three vehicles at the barrier, (2) the barrier never being lowered, and (3) each of those vehicles eventually drive away.9 The evidence does contradict the Grievant's testimony "he raised and lowered the gate after the CW employee came by."

However, the totality of the credible evidence in the matter does not establish the precise times of any misconduct by the Grievant. Such information is required to establish a violation of the Employer's Insubordination Policy.

The evidence establishes, clearly, the Grievant failed to perform an essential function of his job, at times during the relevant 45-minute period. However, I find, there is insufficient evidence to conclude the Grievant, after receiving the order from Lieutenant-B to "drop" the barrier, and thereafter, disregarded the order.

## AWARD

It is the decision of this Arbitrator the Employer did not have just cause when it discharged the Grievant. The Grievant's discharge is overturned. The Employer shall reinstate him, immediately, with full seniority, back pay, and benefits paid for the time he was out.

 /s/ Alvin R. Wilson, Jr.
Alvin R. Wilson, Jr., Arbitrator

---

### [i] **End Note**

1.  CSOC-Baker testified she observed "at least three" vehicles approach the barrier at Post 62 – a CW (contractor) "golf cart/buggy and 2 others, although she could not recall the specific make and model of the other vehicles. She did not state what time this occurred. According to the notes CSOC-Supervisor, it may have been at or about 6:49 a.m. [i]CSOC-Baker testified she saw the occupant of the CW vehicle get out, swipe his access card, get back in the vehicle, "wait about two minutes but the barrier did not go down."

2.  CSOC-Baker testified, not long after this, the occupant of a second car got out, scanned their card, returned to their car, and waited about 2 minutes, but the barrier was "did not go down." She did not see where this car went.

3.  CSOC-Baker did not recall how long the third vehicle was at the barrier or if its occupant attempted to speak with the Grievant; she did recall seeing hand gestures.

4.  CSOC-Baker testified FPS can request video be saved, but did not do so in this case.

5.  CSOC-Supervisor-Contemporaneous-Notes reflect that at 6:49 a.m. "COSC observed personnel being turned around/away from Booth B because [the Grievant] refused to lower the barrier."

6.  CSOC-Supervisor testified she spoke with the Grievant two or three times on the morning of August 26, 2024 during some of his repeatedly calls.

7.  CSOC-Supervisor testified she did not recall if the Grievant refused to lower the barrier.

8.  CSOC-Supervisor testified the Grievant called the CSOC six times that morning, between approximately 6:18 a.m. to 7:00 a.m. repeating his concerns. He was advised to speak with his Supervisor and that the CSOC-Staff could not assist him.

9.  CSOC-Supervisor testified that between 6:18 a.m. and 7:00 a.m., she never  (1) observed the Grievant lower the barrier or (2) saw the "Rover" go near the barrier, although the Grievant claimed it did.

10. CSOC-Baker testified after she saw the CW cart turn around and drive away, she observed the occupant of different vehicle exit their car, walk to the scanner, swiped their card, and wait for a few minutes, but barrier did not go down.  She did not recall where that vehicle went.

11. CSOC-Baker testified if a vehicle is not permitted through the barrier at Post 62,  which is located inside a secured area, the only way to gain access to the STE Campus is to exit to an unsecured area and attempt to reenter through a gate that requires going through canine and other screening again.

12. At 6:49 a.m., the CSOC-Staff witnessed vehicles turned around and pull away from Post 62 because the Grievant still had not lowered the barrier.

13. CSOC-Supervisor-Contemporaneous-Notes state, "At 6:52 a.m., the Grievant called CSOC again.  He told them, once again, "he will not be dropping the barrier ... and that is was starting to get backed up at Booth B." CSOC Staff, observed personnel turning around at Post 62 because the Grievant had still was not dropping the barrier."

14. Lieutenant-B asked the CSOC-Supervisor for a statement explaining what she (and her staff) witnessed the Grievant do and say on the morning of August 26, 2024.  She obtained her supervisor's approval to do so.  CSOC-Supervisor sent an email to Lieutenant-B, on August 26, 2024, stating:

> Approx. 0618hrs 8/26/24 PSO Owen called CSOC and spoke with Jones.  Owens advised he was requesting FPS to respond to his location due to him being tired, not feeling safe with his weapon, and that he didn't feel comfortable working the barrier.  Following that 11DW1255 (Inspector D. Williams) was notified of the situation.  He stated that this would need to be handled by the PSO's Supervisor at the time.  Lt. Barnett was contacted and made aware of the situation.  He advised that PSO Owens was being held over and that he was trying to go home.  Between then there was an additional 2 more phone calls received from PSO Owens advising the same thing and requesting FPS.  He was advised he needed to speak with his Supervisor and that FPS stated they could not assist at this time.  Lt. Barnett was notified by myself of PSO Owens calling in CSOC numerous times about his situation and that CSOC advised him of the same results.  @0652hrs PSO Owens had called again speaking with Jones advising the same statement and that he will not dropping the barrier at Booth B (Post 62) since he didn't have relief and that it was starting to get backed up at Booth B.  While Jones was on the phone with Owens, Lt. Barnett called to confirm if CSOC received any more calls from PSO Owens, to which he was made aware we were currently on the phone with him, and he was refusing to drop the barrier.  @0649hrs CSOC Observed personnel being turned around/away from Booth B because PSO Owens refused to lower the barrier.